467 So.2d 348 (1985)
SEABOARD SYSTEM RAILROAD, INC., Lone Star Building Centers (Eastern), Inc., and Futura Coral Way Properties 1, Ltd., Appellants,
v.
Anthony J. CLEMENTE As Director of the Department of Environmental Resources Management, for and On Behalf of METROPOLITAN DADE COUNTY, etc.; Stanley Davidson, Individually, Appellees.
Anthony J. CLEMENTE As Director of the Department of Environmental Resources Management, for and On Behalf of METROPOLITAN DADE COUNTY etc., Appellant,
v.
SEABOARD SYSTEM RAILROAD, INC., and Futura Coral Way Properties 1, Ltd., Appellees.
FUTURA CORAL WAY PROPERTIES 1, LTD., and Seaboard System, Etc., Appellants,
v.
Anthony J. CLEMENTE As Director Etc., for and On Behalf of METROPOLITAN DADE COUNTY, Appellee.
Nos. 83-2515, 83-2623 and 83-2464.
District Court of Appeal of Florida, Third District.
March 12, 1985.
As Corrected on Denial of Rehearing April 30, 1985.
*351 Goodwin, Ryskamp, Welcher & Carrier and Kenneth Ryskamp, Miami, for Seaboard.
Peeples, Earl, Reynolds & Blank and Nina S. Kole and Robert Blank, Miami, for Lone Star.
Greenberg, Traurig, Askew, Hoffman, Lipoff, Rosen & Quentel and Clifford Schulman and Timothy A. Smith, Miami, for Futura in No. 83-2515.
Morgan, Lewis & Bockius and Richard A. Pettigrew, Miami, for Davidson.
Robert A. Ginsburg, County Atty. and Peter S. Tell, Asst. County Atty., Miami, for Clemente.
Lapidus & Stettin and Richard L. Lapidus, Miami, for Futura in No. 83-2464.
Before BASKIN, DANIEL S. PEARSON and JORGENSON, JJ.
BASKIN, Judge.
In these consolidated appeals we are asked to decide the extent of the respective responsibilities of various corporate and individual parties for the elimination and disposal of toxic waste material (toxic sludge) which has accumulated and continues to accumulate on the property located at 7000 Coral Way [the site] in such massive concentrations as to pose a threat to the ground water of Dade County. The trial court issued a preliminary injunction against appellants, Futura's Coral Way Properties I, Ltd. [Futura], Seaboard System Railroad, Inc. [Seaboard], and Lone Star Building Centers, Inc. [Lone Star] and appellee Stanley S. Davidson [Davidson], requiring them to retain environmental consultant Enviropact, Inc. [Enviropact] to effectuate the safe and expeditious removal of the toxic sludge and to conduct additional tests designed to detect the presence of other hazardous substances on the site. The trial court subsequently held Futura and Seaboard in contempt for failing to comply with the preliminary injunction. Futura, Seaboard, and Lone Star appeal the order granting preliminary injunction, relief, and Futura and Seaboard appeal the contempt order. For reasons more fully developed below, we affirm the grant of injunctive relief against appellants pursuant to the anti-pollution and nuisance provisions of Chapter 24 of the Code of Metropolitan Dade County and reverse the judgment of contempt against Futura and Seaboard.
The environmental hazards emanating from the Coral Way site are traceable to the lumber treatment operation conducted between 1968 and 1981 by the various parties who owned or operated the wood-treating facility located on the site. The treatment *352 was designed to prevent termites and to preserve the wood through the use of a chemical solution, chromated copper arsenate, or CCA. The elements comprising this solution, copper, chromium, and arsenic, are classified as heavy metals; arsenic and chromium are regulated contaminants under section 24-11 of the Code of Metropolitan Dade County. The procedure was initiated by inserting the wood to be treated into a long cylindrical pressure-treating tank. After treatment, the wet wood was moved to various open drying areas near the plant and stacked on large timbers elevated from the ground. During the drying process, excess solution dripped from the newly treated wood onto the ground. The accumulation of chromium, copper, arsenic, and creosote drippings from the drying lumber has contaminated and continues to contaminate the soil and ground water on the site of the former wood-treating plant.
Pertinent to this litigation is the fact that both the wood-treating plant and the property on which it was located have undergone several changes in ownership and operation during the evolution of the present pollution problem. Seaboard owned the land from 1941 through 1980. During this period, Seaboard leased the land underlying the wood-treating plant, first to Miami Wood Treating Facility from 1941 to 1968, then to Lindsley Lumber, a subsidiary of Lone Star from 1968 to 1972. Lone Star acquired the plant in 1972 and continued operating it until 1979, when it sold the facility to Davidson Lumber. Seaboard's ownership of the land terminated in 1980, when Davidson purchased the land beneath the wood-treating plant. Davidson ceased operation of the plant in 1981. In 1982, Futura entered the picture, purchasing the property from Davidson to conduct its real estate development business.
Procedurally, this action commenced when Dade County issued administrative Notices of Violation and Orders for Corrective Action to Futura and, subsequently, to Davidson. The notices cited Futura and Davidson with pollution and nuisance violations pursuant to Chapter 24 of the Dade County Code and required the submission of a plan for the elimination and disposal of the hazardous substances. Futura refused to comply with the notice requirements. Davidson, however, entered into a consent agreement with the county, admitting partial responsibility for the code violations and agreeing to retain environmental consultant, Enviropact, to conduct testing on the site to determine the extent of the contamination.
Subsequent to this administrative action, the county filed a complaint against Davidson, Futura, Lone Star, and Seaboard (defendants) seeking injunctive and other relief for alleged violations of the anti-pollution and nuisance ordinances of the Dade County Code. A few months later, the county served defendants with a formal administrative order, advising the parties of the extensive soil and ground water pollution on the site and requiring the immediate removal of toxic sludge located in certain areas on the site; these "hot spots" contain high concentrations of the contaminants. The county then filed a Motion for Preliminary Injunctive Relief against all of the defendants, seeking removal of the toxic sludge and requiring further testing in compliance with the previously issued administrative order. After conducting a hearing on the motion, the trial court entered an Order Granting Preliminary Injunctive Relief. The trial court found:
(a) Irreparable harm to the public health, safety, and welfare has occurred and will continue to occur unless injunctive relief is granted.
(b) Defendants Lone Star Building Centers (Eastern), Inc., Seaboard System Railroad, Inc., Stanley S. Davidson, individually, and Futura's Coral Way Properties I, Ltd., have violated and continue to violate Sections 24-11(1)(a), (b) and (c) of the Code of Metropolitan Dade County, 24-14 of the Code of Metropolitan Dade County, and 24-26 of the Code of Metropolitan Dade County, Florida, and therefore irreparable injury has occurred and continues to occur as a matter of law. Harvey v. Wittenberg, 384 So.2d 940 *353 (Fla.3d DCA 1980); State v. Samscot Enterprises, Inc., 297 So.2d 69 (Fla.4th DCA 1974); Rich v. Ryals, 212 So.2d 641 (Fla. 1968). Plaintiff has therefore demonstrated a substantial likelihood of success on the merits.
(c) The violations aforesaid consist, in part, of toxic sludge located on the subject property which must be expeditiously and safely removed from the property and disposed of in accordance with all applicable laws.
(d) The Court specifically finds that the protection of the drinking water supply of the citizens of this community far outweighs any alleged interests of any or all of the aforesaid defendants. The toxic sludge in its present location poses a serious threat to the waters of Dade County and the health, safety, and welfare of the community which depends upon those waters for its potable water supply.
(e) The Court finds that the evidence adduced at the aforesaid hearing clearly indicates that other areas on the subject property are in violation of the aforesaid provisions of the Code of Metropolitan Dade County, Florida, and similarly may pose a serious threat to the waters of Dade County and the health, safety and welfare of the community which depends upon those waters for its potable water supply. Similarly, protection from this threat to the drinking water supply of the citizens of this county clearly outweighs any alleged interests of any or all of the aforesaid defendants.
(f) Preliminary injunctive relief is clearly in the public interest, and the failure to grant such relief would result in further injury to the public. Wilson v. Sandstrom, 317 So.2d 732 (Fla. 1975); Dept. of Business Regulation v. Provende, Inc., 399 So.2d 1038 (Fla.3d DCA 1981).
Based upon these findings, the trial court ordered, in pertinent part, the following injunctive relief:
(a) The aforesaid Defendants shall forthwith jointly retain the services of Enviropact, Inc., as the primary consultant and contractor to accomplish the expeditious and safe removal, transportation and disposal of the toxic sludge on the subject property....
(b) The aforesaid Defendants shall forthwith and until further Order of this Court retain the services of Enviropact, Inc. as the primary consultant and contractor to accomplish such further testing as may be reasonable and necessary to determine the extent and nature of the ground and water pollution in the other areas of the subject property. Said testing shall be accomplished no later than sixty (60) days from the date of this Order.
Upon motion by the county, the trial court subsequently entered an order finding Seaboard and Futura in indirect civil contempt for failure to comply with the injunction. Because Davidson previously entered into a consent agreement with the county, admitting partial liability for the pollution violations, only Futura, Seaboard, and Lone Star appeal the preliminary injunction. Davidson appears as an appellee, supporting the injunctive relief ordered by the trial court. Futura and Seaboard appeal the contempt order.
We focus our attention first on the propriety of the preliminary injunction against the three appellants, Futura, Seaboard, and Lone Star. Futura asserts that because it is merely the present owner of the contaminated property, it bears no responsibility for the pollution generated by the former wood-treating plant long before Futura purchased the property. Futura maintains that its brief connection to the site cannot, as a matter of law, support the trial court's imposition of liability against it for violations of Chapter 24. Seaboard contends that it was responsible neither for supervising nor for directing the wood-treating operation and was merely a passive owner/lessor of the unimproved property. It asserts that because the record is devoid of evidence suggesting that Seaboard had any knowledge of the hazardous wastes discharged during the wood-treating procedures, *354 the trial court committed error in holding Seaboard liable for violations of Chapter 24. Lone Star argues that the county failed to prove that it violated the anti-pollution and nuisance provisions of the Dade County Code. We reject all of these arguments.
Addressing the contention advanced by Lone Star, we find the record replete with evidence that Lone Star participated in the creation of the existing pollution problem through its operation of the wood-treating procedure which dripped contaminating chemicals into the soil and ground water on the site.[1]
The record discloses that the soil and ground water contamination on the Coral Way site greatly exceeds both county and federal toxic waste standards.[2] Furthermore, *355 the undisputed evidence establishes that environmental poisons have been accumulating throughout the many years during which each of the defendants owned or leased the land or operated the wood-treating facility responsible for the dangerous pollution discharges. It is upon these established facts that the trial court correctly determined, as a matter of law, that all of the defendants violated the environmental pollution prohibitions of the code and that each is responsible for a portion of the necessary and required cleanup.
We find no merit in the contentions of either Futura or Seaboard that liability may not be imposed under Chapter 24 where a party neither actively participated in nor possessed knowledge of the discharge or maintenance of hazardous substances on the polluted property. We find no reason to permit any appellant to escape responsibility for the continuing environmental contamination on the Coral Way site. Our ruling results from a determination that the applicable provisions of the Dade County Code impose strict liability for the discharge of pollutants and for the maintenance of a nuisance, without regard to considerations of knowledge or fault.
Analyzing the Dade County Code provisions applied by the trial court in issuing injunctive relief against appellants, we begin with the well-settled axiom that where the language in a statute clearly and unambiguously conveys legislative intent, it is unnecessary to resort to statutory construction. Courts should not depart from the plain language employed by the legislature. Citizens of State v. Public Service Commission, 425 So.2d 534 (Fla. 1982). See In Interest of J.F., 384 So.2d 713 (Fla.3d DCA 1980); Kokay v. South Carolina Insurance Co., 380 So.2d 489 (Fla.3d DCA 1980), aff'd, 398 So.2d 1355 (Fla. 1981). A second controlling principle of statutory construction is the rule that words of common usage should be construed in their plain and ordinary sense. Citizens; Tatzel v. State, 356 So.2d 787 (Fla. 1978). We direct our consideration, therefore, to the plain meaning of the language used in the applicable Dade County ordinances. St. Petersburg Bank & Trust Co. v. Hamm, 414 So.2d 1071 (Fla. 1982).
Section 24-11 prohibiting water pollution, provides:
(1) PROHIBITIONS AGAINST DISCHARGE. It shall be unlawful for any person to throw, drain, run or otherwise discharge into any of the waters of this county, or to cause, permit or suffer to be thrown, run, drained, allowed to seep, or otherwise discharged into such water any organic or inorganic matter which shall:
(a) Breach the values set forth in section 24-11(2);
(b) Cause water pollution as herein defined; or
(c) Cause a nuisance or sanitary nuisance as herein defined. (emphasis supplied)
Section 24-14, prohibiting the existence of a nuisance, provides:
No person shall cause, or allow to be caused, any nuisance or sanitary nuisance as defined in sections 24-3(42), 24-3(58) and/or 24-26 hereof. In addition to all other remedies he may have, the director, environmental resources management, is authorized to seek, in the appropriate court, injunctive relief, both of a temporary and permanent nature, against any person causing or allowing to be caused, any such nuisance. (emphasis supplied)
Section 24-26, prohibiting nuisances injurious to health, or sanitary nuisances, provides:
(1) The following conditions existing, permitted, maintained, kept or caused by any individual, municipal organization or corporation, governmental or private, shall constitute prima facie evidence of maintaining a sanitary nuisance:
(a) Untreated or improperly treated human waste, garbage, offal, dead animals or dangerous waste materials *356 from manufacturing processes harmful to human or animal life and air pollutants, gases and noisome odors which are harmful to human or animal life.
(b) Improperly built or maintained septic tanks, water closets or privies.
(c) Discharging, or allowing the discharge of septic tank pump-out wastes into streams, or surface waters or underground acquifers or into ditches, drainage structures or on the ground surface.
(d) Supplying potable water without providing disinfection by a public water supply system. (emphasis supplied)
Apparent from the plain, unambiguous language and grammatical construction of the applicable ordinances is the imposition of liability for both active environmental contamination (e.g., "throw," "drain," "run," "discharge") and passive acts of pollution (e.g., "permit," "suffer," "allow"). Our concern is whether the prohibited passive acts are attributable to appellants Seaboard and Futura.
The dictionary definitions of the relevant words denoting passive liability are:

permit  to allow the act or existence of; to tolerate

suffer  to allow; to permit; not to forbid or hinder; to tolerate; to put up with

allow  let; endure ... allow may imply little more than forbearance of prohibition, as that may be tacitly allowed which is not expressly permitted
Webster's New International Dictionary of the English Language (2d ed. 1960).
According to the evidence, Futura, the present owner of the polluted Coral Way site, allowed the toxic waste to continue seeping into the ground water by failing to take any steps to clean it up. Although Futura did not actually dump the hazardous chemicals onto the property, it nonetheless violated Dade County's unambiguous prohibitions against "tolerating," "putting up with," or "failing to forbid or hinder" the contaminated condition on its property. Similarly, Seaboard, owner of the property for forty years and lessor of the land beneath the wood-treating plant throughout its principal period of operation, "endured," "put up with," and "failed to forbid or hinder" the continuous discharge of toxic substances into the soil and ground water. Thus, Seaboard's lack of knowledge of the contaminating activities, like Futura's lack of participation, is irrelevant to a determination of liability under Dade County Code sections 24-11, 24-14, and 24-26. Absent from these ordinances is any requirement of either fault for or knowledge of the prohibited discharge or tacit maintenance of hazardous wastes in the environment. Applicable here is the general rule of statutory construction that the mention or enumeration of one thing implies the exclusion of another. Ideal Farms Drainage District v. Certain Lands, 154 Fla. 554, 19 So.2d 234 (1944); James v. Department of Corrections, 424 So.2d 826 (Fla. 1st DCA 1982); Azar v. Graham, 194 So.2d 684 (Fla. 3d DCA), aff'd, 204 So.2d 193 (Fla. 1967). "[W]here a statute enumerates the things on which it is to operate, it is ordinarily construed as excluding from its operation all those not expressly mentioned." James at 827.
In light of the foregoing principle of statutory construction, we conclude that the Dade County environmental protection ordinances render appellants strictly liable for either active contribution to the pollution or tacit acceptance of the contaminated condition on the Coral Way site.
Other jurisdictions agree with the imposition of strict liability for violations of toxic waste laws similar to those in Dade County. See State, Department of Environmental Protection v. Ventron, 94 N.J. 473, 468 A.2d 150 (1983) (statute providing that "[n]o person shall allow any dyestuff, coal tar, sawdust ... to be turned into or allowed to run into any of the waters of this state" construed to impose strict liability on anyone allowing pollutants to escape into the state waters); Department of Health v. Concrete Specialties, Inc., 112 N.J. Super. 407, 271 A.2d 595 (1970) (statute *357 providing that "[n]o person shall cause, suffer, allow or permit smoke from any fuel burning equipment ... to be emitted into the open air" held to impose strict liability).
Further support for the assessment of strict liability appears in Code of Metropolitan Dade County section 24-57(g), enacted subsequent to the issuance of the preliminary injunction but during the pendency of this appeal. Section 24-57(g) provides:
Whenever a violation of this chapter occurs or exists, any person, individually or otherwise, who has a legal, beneficial, or equitable interest in the facility or instrumentality causing or contributing to the violation or who has a legal, beneficial, or equitable interest in the real property upon which such facility or instrumentality is located shall be jointly and severally liable for said violation regardless of fault and regardless of knowledge of the violation. This provision shall be construed to impose joint and several liability, regardless of fault and regardless of knowledge of the violation, upon all persons, individually or otherwise, who, although no longer having any such legal, beneficial or equitable interest in said facility or instrumentality or real property, did have such an interest at any time during which such violation existed or occurred or continued to exist or to occur. This provision shall be liberally construed and shall be retroactively applied to protect the public health, safety, and welfare and to accomplish the purposes of this chapter.
The threshold question for our consideration is whether the recently enacted ordinance applies retroactively to the parties in this action.
Generally, disposition of an appeal should be consistent with the law in effect when the appellate decision is rendered rather than with the law in effect at the time judgment is entered. State v. Lavazzoli, 434 So.2d 321 (Fla. 1983); Hendeles v. Sanford Auto Auction, Inc., 364 So.2d 467 (Fla. 1978). This rule does not apply to a new law which alters a substantive right. Lavazzoli. When a new law is a statute or ordinance, as in this case, our consideration turns to the question whether the legislation should be applied prospectively or retroactively. The generally accepted rule of construction is that absent an express legislative declaration to the contrary, a law is presumed to operate prospectively. Lavazzoli; Seddon v. Harpster, 403 So.2d 409 (Fla. 1981); Walker & LaBerge, Inc. v. Halligan, 344 So.2d 239 (Fla. 1977); Fleeman v. Case, 342 So.2d 815 (Fla. 1976). The current ordinance expressly provides that it "shall be retroactively applied... ." Section 24-57(g), Code of Metropolitan Dade County. Where retroactive intent is expressly indicated, as in this case, courts generally give it that effect unless the provision would "violate the constitution or result in manifest injustice." Ventron, 468 A.2d at 163. We find that neither of these prohibitions bars retroactive application of section 24-57(g) and that because it is a remedial measure affecting a previously existing right of action, the ordinance applies retrospectively to the present action. See, e.g., Village of El Portal v. City of Miami Shores, 362 So.2d 275 (Fla. 1978); City of Lakeland v. Catinella, 129 So.2d 133 (Fla. 1961); City of North Bay Village v. City of Miami Beach, 365 So.2d 389 (Fla.3d DCA 1978).
Retroactive application of the new ordinance is not unconstitutional for two reasons. First, because this provision is not a criminal law, it does not fall within the prohibition against ex post facto laws. See Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344, reh'g denied, 434 U.S. 882, 98 S.Ct. 246, 54 L.Ed.2d 166 (1977). Second, the due process clause does not bar retroactive application of civil legislation unless it operates to create new rights or to destroy vested rights, City of North Bay Village; City of Lakeland, or its consequences are unduly harsh and oppressive. United States Trust Co. v. New Jersey, 431 U.S. 1, 17 n. 13, 97 S.Ct. 1505, 1515 n. 13, 52 L.Ed.2d 92, 106 n. 13, reh'g denied, 431 U.S. 975, 97 S.Ct. 2942, 53 *358 L.Ed.2d 1073 (1977); Ventron, 468 A.2d at 163.
The newly enacted ordinance, section 24-57(g), merely defines and delineates the scope and breadth of the strict liability imposed under the previously existing environmental protection provisions of Chapter 24. We conclude, therefore, that because it neither creates new rights nor takes away vested rights, but operates only to further an existing remedy or to confirm an existing right, it does not fall within the legal conception of a prohibited retrospective law. See, e.g., Village of El Portal; City of Lakeland; City of North Bay Village; Grammer v. Roman, 174 So.2d 443 (Fla.2d DCA 1965). Furthermore, we do not find retroactive application of this ordinance unduly harsh in a due process sense since the environmental protection benefits accorded the public by this provision far exceed any burden imposed upon appellants. See Ventron.
We conclude, therefore, that the Dade County environmental protection ordinances at issue here subject appellants to strict liability. Finding that the record is replete with evidence substantiating the trial court's determination that appellants have violated and continue to violate these provisions, and that the scope of the relief ordered by the trial court was appropriate in all respects,[3] we affirm the entry of the preliminary injunction. See Martin v. Pinellas County, 444 So.2d 439 (Fla.2d DCA 1983), review denied, 451 So.2d 849 (Fla. 1984); Harvey v. Wittenberg, 384 So.2d 940 (Fla.3d DCA 1980); City of Miami v. City of Coral Gables, 233 So.2d 7 (Fla.3d DCA 1970).
Our final concern in this appeal is the propriety of the trial court's order finding Futura and Seaboard in contempt for violating the terms of the preliminary injunction. We conclude that the directives of the preliminary injunction order were not sufficiently clear and definite to apprise the parties of the court's mandate, and, accordingly, we reverse the order of contempt against Futura and Seaboard. See Loury v. Loury, 431 So.2d 701 (Fla.2d DCA 1983); Kranis v. Kranis, 313 So.2d 135 (Fla.3d DCA 1975).
Affirmed in part; reversed in part.
NOTES
[1] Testimony of the former plant manager of the wood-treating facility, Nard Walden, revealed:

A... .
In the nine months of 1968, this was when we were acquired by Mr. Stuart of National Building Centers [Lone Star], we treated up approximately four million seven hundred and forty-six thousand four fifty-four board feet.
In 1969 we treated seven million six hundred seventy-one thousand one hundred thirty-four board feet.
Q. In 1969, who was operating the facility at that point, sir?
A. That was National Building Centers, or Lone Star. I combine them all together.
Q. All right, sir. 1970?
A. 1970 was six million eight hundred and five thousand seven hundred and fifty-five board feet.
Q. And who was operating it then, sir?
A. The same company, National Building Centers.
Q. Okay, sir.
A. In 1971, it was six million eight hundred sixty-one thousand five hundred eighty-two board feet.
Q. Same operator?
A. Yes, sir.
In 1972, it was seven million six hundred ninety thousand six hundred fifty-seven board feet.
Q. Same operator again, sir?
A. Yes, sir.
1973, it was seven million fifty-seven thousand seven hundred nine board feet.
Q. Same operator again, sir?
A. That's right.
In 1974, it was six million two hundred ninety-six thousand six hundred board feet. Same operator.
1975, it was five million nine hundred sixty-one thousand one hundred four board feet. Same operator.
1976, it was five million seven hundred sixteen thousand five hundred and eight board feet. Same operator.
1977, it was seven million six hundred forty-five thousand two hundred thirty-eight board feet. Same operator.
1978, it was eight million four hundred two thousand one hundred fifty-four board feet. Same operator.
In 1979, for the year, it was a total of eight million six hundred sixty-eight thousand four hundred seventy-eight board feet. In that year, National Building Centers or Lone Star sold the property to Davidson Lumber Company.
[2] Testimony by expert witness, environmental consultant John Tostanaski, revealed:

Q. Let me ask it this way. Did the levels that you found for the substances that I've indicated, do they come within any standards that you're aware of, Federal, State, or County?
A. Generally, when you're dealing with the E.P. toxicity test, you're dealing with Federal standards for hazardous waste, and in our sample, S.P. 1, we showed an arsenic leachibility of 17.5. That would be five parts per million, so it would be over the Code.
Q. By how much?
A. Approximately three times.
Q. Okay.
With respect to what you said, that it is three times the Federal level, is that three times the level that is necessary to qualify as a hazardous waste?
A. Yes.
Q. How does it compare to the actual ground water level?
A. The hazardous waste levels are considerably higher.
Q. So is it a fair characterization that the levels that you're finding out there are far in excess of the Federal hazardous waste levels?
MR. PETTIGREW: Are we talking about, now, the sludges?
BY MR. DuVALL:
Q. We're talking about the sludges.
A. With regard to the arsenic leach, it is considerably higher than the Federal level, in the one sample.
Q. Have you compared the values that you have found under your E.P. toxicity sampling with the ground water levels that are permitted under the County 
A. Yes, we have.
Q.  Code? And what was your finding in that respect?
A. They are in excess of the ground water code for both chromium and arsenic.
Q. Far in excess?
A. Yes.
[3] We recognize that the matter presented to the trial court involved defendants' liability only as it pertained to the grant of preliminary injunctive relief. Ultimate liability remains to be determined.