## COMMERCIAL COATING CORPORATION v STATE OF FLORIDA, DEPARTMENT OF ENVIRONMENTAL REGULATION

### Case No. 87-2637

State of Florida, Division of Administrative Hearings

July 13, 1988

### APPEARANCES OF COUNSEL

**Richard A. Pettigrew,** and **Luis R. Figueredo,** Morgan, Lewis & Bockius, for petitioner.

**E. Gary Early,** State of Florida, Department of Environmental Regulation, for respondent.

### OPINION OF THE COURT

JAMES E. BRADWELL, Hearing Officer.

### *RECOMMENDED ORDER*

Pursuant to notice, this cause came on for hearing before James E. Bradwell, duly designated Hearing Officer, on October 29, 1987, in Miami, Florida. The parties requested and were allowed through

January 20, 1988, to file memoranda supportive of their respective positions. Proposed findings of fact not incorporated herein are the subject of specific findings in an appendix attached hereto.

## INTRODUCTION AND BACKGROUND

This cause arose upon the State of Florida, Department of Environmental Regulation's (Department) proposed denial of eligibility to Petitioner for participation in the Early Detection Incentive (EDI) Program. The EDI Program was established in the State Underground Petroleum Environmental Response (SUPER) Act of 1986, and codified as Section 376.3071(9), Florida Statutes. The EDI Program provides for a state conducted and funded cleanup of sites contaminated as a result of a discharge of "petroleum product" from a "petroleum storage system" as those terms are defined in Sections 376.301(10), and (11), F.S.

Petitioner filed its Notification Application for participation in the EDI Program on or about April 21, 1987. The application identified the materials which were discharged at the Petitioner's facility as mineral spirits, xylene and naphtha. Based on the material discharged, the Department found that the site was not eligible for participation in the EDI Program because mineral spirits, xylene and naphtha are not "petroleum products" as that term is defined in Section 376.301(10), F.S. On May 12, 1987, the Department issued its proposed denial of eligibility to Petitioner.

Petitioner timely requested formal proceedings pursuant to Section 120.57, F.S., contesting its denial of eligibility. In due course, the matter was forwarded to the Division of Administrative Hearings and ultimately to the undersigned Hearing Officer. The hearing was scheduled for October 29, 1987, in Miami, Florida, and was conducted as scheduled.

Petitioner presented the following witnesses at the hearing:

1. Timothy John Gustafson, an employee of Rick Valentine, Incorporated, a wholly owned subsidiary of Enviropact Services, Inc.

2. Donald C. Wassmund, an employee of Enviropact Services, Incorporated, who was accepted as an expert witness in the field of chemistry.

Respondent presented the following witnesses at the hearing:

1. James Aberman, who is President of Commercial Coating Corporation.

2. Patricia Dugan, Administrator of the program management sec-

tion of the Bureau of Restoration, Division of Waste Management, Department of Environmental Regulation.

Petitioner introduced ten exhibits at the hearing. There is some inconsistency in the transcript of this proceeding as to the numbering of certain exhibits, e.g., the EDI application appears as Petitioner's 2 (T/27-28), the Senate bill analyses appear as Petitioner's 4 through 7 and Petitioner's 17 (T/28-29). Therefore, the admitted exhibits will be identified as follows:

P1. Resume of Timothy John Gustafson.

P2. EDI Notification Application dated 4/21/87.

P3. Department notice of determination of ineligibility dated May 12, 1987.

P4. Sketch of Commercial Coating site dated 3/6/87 and approved by T. J. Gustafson.

P7. Resume of Donald Wassmund.

P17. A composite of three Senate Staff Analyses. P17(a) is a Senate Staff Analysis dated February 17, 1986, revised April 10, 1986; P17(b) is a Senate Staff Analysis dated April 10, 1986, revised April 15, 1986; and P17(c) is a Senate Staff Analysis dated April 28, 1986, revised April 29, 1986.

P20. Affidavit of Georgia Chapman.

P22. Analyses of groundwater samples.

P23. Material data sheet for Gulf Life Charcoal Starter.

P24. Chart entitled Hydrocarbon Mixtures.

In addition to the admitted exhibits, Petitioner offered Exhibits 11-15, consisting of a series of affidavits purporting to demonstrate that waste materials, including spent mineral spirits, may be used as fuel in certain industrial kilns.

I specifically find that Petitioner's exhibits 11 through 15 are written statements offered by Petitioner which corroborates the testimony of witnesses at the hearing. I therefore find these statements to be corroborated hearsay and are admissible in this cause.

Respondent introduced the following exhibits:

D1. Excerpt from the Handbook of Toxic and Hazardous Chemicals.

D2. Encyclopedia for the User of Petroleum Products.

D3. 40 CFR Section 261.

D4. 40 CFR Section 266.

It was agreed at the hearing that Proposed Recommended Orders would be submitted within twenty (20) days of the filing of the transcript with the Division of Administrative Hearings. The transcript was filed on November 25, 1987, and Petitioner's Proposed Recommended Order was filed within twenty days of that date. Due to an apparent filing error, the Department did not learn of the filing of the transcript until it received Petitioner's Proposed Order. Therefore, the Department was granted an extension until January 6, 1988, to file its Proposed Order in this case.

For purposes of this Recommended Order, citations to the transcript will be designed by (T/—), followed by the appropriate page number. References to exhibits will be designed by (P—) for Petitioner's Exhibits, and (D—) for Department's Exhibits, each followed by the appropriate exhibit number and page number.

### ISSUE PRESENTED

The sole issue to be resolved in this proceeding is whether the materials commonly known as mineral spirits, xylene and naphtha fall within the definition of "petroleum products" in Section 376.301(10), F.S.

The Department asserts that mineral spirits, xylene and naphthas are *not* "petroleum products" as that term is defined in the statute.

If mineral spirits, xylene and naphthas are within the scope of the definition, then monies from the Inland Protection Trust Fund will be available under the EDI Program to fund a site sponsored clean up of Petitioner's property. If mineral spirits, xylene and naphtha are not within the scope of the definition, then Petitioner will be responsible for cleaning up the contamination emanating from its property. If Petitioner is financially unable to clean up the contamination, monies from the Water Quality Assurance Trust Fund would be available to clean up the site. In any case involving the expenditure of Water Quality Assurance Trust Fund money, it is the duty of the Department to seek cost recovery. Section 376.307, F.S.

In order to decide whether the Department was correct in excluding mineral spirits, xylene and naphtha from the definition of petroleum product, I must determine whether the Department has construed the statute in a permissible way under Administrative Procedures Act disciplines. *See Department of Administration v Nelson,* 424 So.2d 852 (Fla. 1982). The standard of review in this case is whether the Department's interpretation of the statute, which is has been charged with the duty to administer, is within the range of possible interpreta-

216

tions. *Natelson v Department of Insurance,* 454 SO.2d 31 (Fla. 1st DCA 1984); *Nelson, supra,* at 858.

## FINDINGS OF FACT

1. The State Underground Petroleum Environmental Response (SUPER) Act of 1986 was enacted as Chapter 86-159, Laws of Florida, to provide for the expeditious cleanup of property contaminated with petroleum or petroleum products. The Act recognizes the vulnerability of Florida's groundwater to contamination and provides several mechanisms by which cleanups of contamination resulting from the storage of petroleum and petroleum products may be funded. See sections 376.30(1), and 307.3071(a), F.S. The purpose of the SUPER Act cleanup programs is to avoid delays in cleanups resulting from litigation and determinations of liability.

2. As part of the SUPER Act, the legislature created the program which is of direct relevance in this litigation. In Section 376.3071(9), the Early Detection Incentive (EDI) Program was created. That program provides for cleanups of sites contaminated with discharges from petroleum storage systems. The cleanups are to be conducted by the state at its expense, with no recourse for restitution of the costs against the site owner. In order to be eligible, one must have a discharge from a "petroleum storage system," as that term is defined in Section 376.301(11), F.S., is a stationary tank with its integral piping and dispensing units which is used for the storage of petroleum product.

3. In order to become eligible for participation in the EDI Program, a site must have been contaminated with "petroleum product." Owners of sites which are not eligible for participation in the EDI program must clean up their sites at their own expense, just as the owners of sites contaminated with a myriad of other pollutants not classified as "petroleum product" must do. Section 376.305(5), F.S. Reasons for EDI Program ineligibility can include the nature of the substance discharged, the statutory ineligibility criteria contained in Section 366.3071(9)(b)3, F.S., and the date of the discharge report. Section 376.3071(9), F.S.

4. Petitioner, Commercial Coating Corporation, is a paint manufacturer located at 3501 N.W. 74th Street, Miami, Florida (T/77; P2). It primarily makes trade sales paint, commonly referred to as house paint, but also produces some specialized paints. (T/77-78).

5. The petitioner's facility consists of eleven (11) underground tanks (T/37; P4). Two of the tanks contained mineral spirits (T/39,41), six of

**217**

the tanks contained resins (T/42), one tank contained VM&P naphtha (T/42), and one tank was not in use. It is not known what the eleventh tank contained. VM&P naphtha is an acronym for Varnish Makers and Painters naphtha, which is commonly used as a solvent in paints and varnishes (D2 at p.51).

6. As a result of a discharge from one or more of the tanks, Petitioner's site has become contaminated. The contamination consists primarily of mineral spirits, xylene and naphtha. (T/38-41; P22 at p. 2-5). The only type of naphtha for which competent substantial evidence exists of storage at the site is VM&P naphtha. Other contaminants at the site include toluene, benzene, and ethyl benzene (T/39/40; P2 at p. 2-5).

7. The contamination was discovered on or about December 5, 1986 (P2). A consulting firm was hired and began assessment work at the site on December 22, 1986 (T/43). The results of the assessment were compiled on April 6, 1987 (P22). The Petitioner filed its EDI Program Notification Application on or about April 21, 1987 (P2). The application was denied by the Department on May 21, 1987. The basis of the denial was that mineral spirits, naphtha and xylene are not "petroleum products" as that term is used in Chapter 376, F.S. (P3).

8. "Petroleum product" is defined in Section 376.3071(10), F.S., as follows:

"Petroleum product" means any liquid fuel commodity made from petroleum, including, but not limited to, all forms of fuel known or sold as diesel fuel, kerosene, all forms of fuel known or sold as gasoline, and fuels containing a mixture of gasoline and other products, excluding liquified petroleum gas and American Society for Testing and Materials (ASTM) grades no. 5 and no. 6 residual oils, bunker C residual oils, intermediate fuel oils (IFO) used for marine bunkering with a viscosity of 30 and higher, asphalt oils, and petrochemical feedstocks.

Sites which are contaminated with substances other than "petroleum product" are ineligible to participate in the EDI Program.

9. In determining whether mineral spirits, xylene and naphtha are petroleum products, it must first be determined whether they are a liquid, a fuel, and a commodity.

10. Mineral spirits, xylene and naphtha are clearly liquids (T/57). As far as their physical composition, they are not dramatically different from gasoline. Mineral spirits and naphthas are distillates of crude petroleum oil and, in terms of boiling point, exhibit similarities to

**218**

gasoline (T/52-54). They are also similar in terms of boiling point to "a variety of common solvents" (T/53). There is no evidence on the record regarding the boiling point of xylene or its physical nature. As will be discussed in greater detail herein, mineral spirits, xylene and naphthas are commonly classified as solvents.

11. Pure mineral spirits, xylene and naphthas are, in the common usage of the term, commodities. The term commodity is defined as "anything useful or that can be turned to commercial or other advantage." The American Heritage Dictionary (1981). Mineral spirits is a common solvent which can be purchased at many retail establishments. Although there is no evidence on the record that pure xylene or naptha is a commodity, it may be presume that it has value. While pure, unadulterated mineral spirits have some value, there is no evidence on the record that "spent" mineral spirits have any value. "Spent" mineral spirits are mineral spirits which have become contaminated to the point they cannot be used for their intended purpose (T/74). There is no record foundation to support a finding that spent mineral spirits have any value or worth, or otherwise may be considered to be commodities.

12. Had the legislature intended its definition of "petroleum product" to "any liquid commodity . . . ," it is quite possible that mineral spirits, xylene and naphthas would fall within the ambit of the definition. However, the legislature did not limit its definition in that manner. In making the determination as to the types of materials to be covered under the SUPER Act, the legislature provided that the material must be a fuel. It is that condition which eliminates mineral spirits, xylene and naphthas from inclusion under SUPER Act.

13. In establishing the type of materials which would be "petroleum products," the legislature provided that the term would include "liquid fuel commodities" including, but not limited to diesel fuel, kerosene and gasoline. Section 376.301(10), F.S. Diesel fuel is commonly recognized as a fuel which is burned in an engine or in industrial service. (T/70; D2 at pp.13). Kerosene is commonly recognized as a fuel commonly used for lighting and heating and as a fuel in internal combustion engineers (T/70; D2 at p. 27). Although kerosene may have some specialized use in the paint industry as a solvent (T/80), it is generally known as a "thin oil . . . used as a fuel" American Heritage Dictionary (1981). Gasoline is a fuel used as motor fuel and aviation fuel (T/70; D2 at p. 21). The term "petroleum product" may, by the use of the inclusive term "including but not limited to . . . ," include substances which are not identical to the listed substances but which are similar in terms of nature and use. Therefore, "petroleum

**219**

product" may be construed to include products such as ASTM Grade No. 1 fuel oil (a kerosene type substance used as a fuel [T/70; D2 at p. 20]); ASTM Grade No. 2 fuel oil (substantially equivalent to diesel fuel, [T/70; D2 at p. 20]); jet or turbo fuel (a kerosene type fuel [D2 at p. 49]); and aviation gasoline (a high quality gasoline based fuel [T/53; D2 at p. 5]). Each of these substances are commonly known and used as fuel, either for internal combustion engines, jet engines, industrial processes or for heating.

14. Mineral spirits are a type of naptha commonly recognized as a solvent rather than a fuel. In the Encyclopedia for Users of Petroleum Product, mineral spirits are defined as "naphthas . . . widely used as solvents or thinners in the manufacture of cleaning products, paints, lacquers, inks, and rubber. Also used uncompounded for cleaning metal and fabrics." (D2 at p. 30). That definition was specifically determined to be an accurate representation of the nature and use of mineral spirits by Petitioner's expert witness (T/20-71). The use to which mineral spirits are put has also been commonly recognized as being "used extensively as a thinner for paints and varnishes." Websters New International Dictionary, 2d Edition (1957). Of the mineral spirits stored at Petitioner's site, "99.9999" percent is used *exclusively* as a solvent (T/79). It is clear that from a petroleum context and a plain meaning context, mineral spirits are not thought of as fuels but rather as' solvents.

15. Naphthas are also commonly regarded as solvents. "Naptha" is a very broad term which refers generally to a mixture of hydrocarbons (T/62). In the Handbook of Toxic and Hazardous Chemicals, napthas are characterized and generally known "as organic solvents for dissolving or softening rubber, oils, greases, bituminous paints, varnishes, and plastics. . . . " (D1 at p. 477). That characterization was specifically found to be accurate by Petitioner's expert witness (T/67). In addition, VM&P Naptha, which is the type of naphtha stored at Petitioner's site, is defined as "Varnish Makers and Painters Naphtha: term for a naphtha commonly used as a solvent in painting and varnishes." There is no evidence on the record that VM&P naphtha, or any naphtha other than that particular grade of naphtha known as mineral spirits, is ever burned for the production of energy. Therefore, Petitioner has not demonstrated that naphthas are ever used as a fuel. It is clear that from a petroleum and chemical context and a plain meaning context, naphtha is thought of as a solvent rather than a fuel.

16. Xylene is commonly regarded as "any of three isomeric, colorless, oily hydrocarbons. . . . Commercial xylene is a mixture of the three and is used as a solvent." Websters New International Dictionary

220

(1957). "It is used as a solvent in the manufacture of snythetic rubber products, printing inks for textiles, coatings for paper and adhesives, and serves as a raw material in the chemical industry" (D2 at p. 53). It is clear that in common use and in use from a petroleum sense, xylene is exclusively a solvent and is never used as a fuel.

17. "Solvent" has been defined as a "compound with a strong capability to dissolve a given substance. The most common petroleum solvents are mineral spirits, xylene, toluene, hexane, heptane and naphthas" (D2 at p. 44). Mineral spirits, naphthas and xylene are so universally regarded as solvents that they form the very definition of that term.

18. The Department has a rational basis for construing the term "petroleum product" to mean those fuels which are of the same type as those enumerated. The types of fuels enumerated are those which, in the common and ordinary meaning of the terms, are used as fuels in engines, industrial processes and heating units. Other than for some minor usage as a component of outboard motor oil (T/62), the only use in which mineral spirits is burned is as charcoal lighter. There is no competent substantial evidence on the record which demonstrates any other use as a burnable substance. There is also no competent substantial evidence on the record that xylene or naphthas, particularly VM&P naphthas, are ever used as fuel, with the exception of approximately 0.00001 percent of the naphtha at Petitioner's site which was used at some time in a fork lift. Had the legislature intended for all flammable petroleum distillates to come within SUPER Act, it would simply have had to phrase its definition of "petroleum product" in that manner. It did not do so, and instead defined "petroleum product" through the commonly understood term "fuel" and used, as examples, three substances which are universally regarded as fuels. The use of mineral spirits as charcoal lighter is sufficiently different from uses of commonly regarded fuels to allow a permissible distinction to be made between those substances. In addition, there is no evidence that charcoal lighter is ever store in a petroleum storage system. I find that the use of mineral spirit-type substances as charcoal lighter does not take away from the ordinary and commonly regarded use of mineral spirits as a solvent.

19. It is clear that in its common meaning, and in its technical meaning, mineral spirits, xylene and naphtha are regarded as solvents and not fuels, notwithstanding the use of a mineral spirit-like petroleum distillate as charcoal lighter.

20. An examination as to the nature of any use of mineral spirits as

221

a fuel substance other than charcoal lighter demonstrates that it is dissimilar to commonly known fuels like diesel fuel, kerosene and gasoline.

21. It was shown that it may be possible for certain waste materials, including "non-pure" or "distressed" mineral spirits to be used to fire industrial boilers. However, Petitioner has never used its spent or non-pure mineral spirits for any purposes other than paint manufacture (T/79-80). Mineral spirits which are "spent" have been contaminated to the point beyond which it cannot be used for its intended purpose (T/73-74). These non-pure waste materials meet the Federal definition for "spent material" in 40 CFR Section 2671.1(c)(1) which defines that term as " . . . any material that has been used and as a result of contamination can no longer serve the purpose for which it was produced without processing." Pursuant to 40 CFR 261.2(c)(2), "spent materials" are solid waste (even though physically they are liquids) and which has a flash point of less than 140 degrees Fahrenheit is a hazardous waste. Mineral spirits have a flash point of between 108 degrees and 132 degrees Fahrenheit (P23 at p.1). Therefore spent mineral spirits are hazardous wastes pursuant to Section 261 of the Code of Federal Regulations. The provisions of 40 CFR Section 2761, have been specifically adopted by the state in *Florida Administrative Code* Rule 17-30.030. These spent solvent materials, when used as a fuel, are referred to as hazardous waste fuels and are burned as an alternative to disposal. 40 CFR Section 266.30. They may only be burned in specialized industrial furnaces and kilns. 40 CFR Sections 266.31, 366.35. These hazardous waste materials are not commonly known, bought or used as fuels in the same manner as diesel fuel, kerosene and gasoline. The legislature has established a statutory program for the regulation of hazardous wastes. *See* section 403.73 *et seq.* It is not realistic to conclude, in light of the specific regulatory program established for hazardous waste, that the legislature would include a potentially hazardous waste by implication as a fuel in the definition of petroleum product.

22. Not only do the common, ordinary, and the technical meanings of the terms "mineral spirits," "xylene" and "naphtha" demonstrate that those materials are not "liquid *fuel* commodities" similar in use to diesel fuel, kerosene and gasoline, but an examination of other related statutes confirms that mineral spirits, xylene and naphthas are thought of by the legislature as something other than fuel. Of primary regard in this respect is the definition of "pollutant" in Section 376.301(12), F.S. Pursuant to the provisions of Section 376.307, sites contaminated with "pollutants," other than those subsequently defined as "petroleum" or

222

"petroleum products" for purposes of the Inland Protection Trust Fund, may be cleaned up with monies from the Water Quality Assurance Trust Fund.

23. The term "pollutants" is defined in Section 376.301(12) F.S. as "any 'product' as defined in § 377.19(11), pesticides, ammonia, chlorine, and derivatives thereof, excluding liquefied petroleum gas."

24. The term "product" in Section 377.19(11), F.S. is defined as follows:

"Product" means any commodity made from oil or gas and includes refined crude oil, crude tops, topped crude, processed crude petroleum, residue from crude petroleum, cracking stock, uncracked fuel oil, fuel oil, treated crude oil, residuum, gas oil, casinghead gasoline, natural gas gasoline, *naphtha*, distillate, condensate, gasoline, waste, oil, kerosene, benzine, wash oil, blended gasoline, lubricating oil, blends or mixtures of oil with one or more liquid products or by-products derived from oil or gas, and blends or mixtures of two or more liquid products or by-products derived from oil or gas, whether hereinabove enumerated or not. (e.s.)

The legislature specifically listed "naphtha," and the related substance "benzine," under the definition of product along with fuels, i.e., gasoline, kerosene and fuel oil, and other non-fuel substances, i.e., residuum, waste oil, lubricating oil. Benzine is "used in the petrochemical industry as a chemical intermediate and reaction diluent and in some applications as a solvent" (D2 at p.5). It is, from a chemical standpoint, often thought of as synonymous to "naphtha" (D1 at p.477).

25. The legislature, by specifically listing naphtha under the definition of "product," evidenced the clear intent to treat it as a separate and distinct material. When the legislature uses certain language in one instance and wholly different language in another, it is presumed that the legislature meant for those terms to mean different things. 49 Fla. Jur. 2d Section 133. Had the legislature intended for naphthas and related solvents (with which mineral spirits may be grouped) to be included within the definition of "petroleum product" it would have specifically listed them as it did in the definition of "product." Based on the examination of the legislative treatment of mineral spirits and naphtha in related statutes, I find that the Department had a reasonable and rational basis for excluding mineral spirits and naphthas from the definition of "petroleum product."

26. Also persuasive in determining the types of materials included in the Chapter 376 definition of "petroleum product" is an examination of

the taxing statute which authorizes the taxing mechanism for the Inland Protection Trust Fund and the Water Quality Assurance Trust Fund.

27. Section 206.9935, F.S. (1986) provides that the Coastal Protection Trust Fund, the Water Quality Assurance Trust Fund and the Inland Protection Trust Fund may be funded by taxes imposed "for the privilege of producing in, importing into, or causing to be imported into this state pollutants for sale, use, or otherwise." Included within the definition of "pollutant" in Chapter 206, F.S., are "petroleum products." Mineral spirits are taxed as "petroleum products," as that term is defined in Section 206.9925, F.S., for the purpose of funding *both* the Inland Protection Trust Fund and the Water Quality Assurance Trust Fund (P20).

28. A very important distinction was made by the legislature between the definition of "petroleum product" in Chapter 376, F.S., and the definition of "petroleum product" for purposes of the taxing statute, Chapter 206, F.S. Unlike the legislative emphasis of fuels in the Chapter 376 definition, Chapter 206, F.S. defines "petroleum product" as:

> Any refined liquid commodity made wholly or partially from oil or gas, or by-products derived from oil or gas, or blends or mixtures of two or more liquid products or by-products derived from oil or gas, and includes, but is not limited to, motor gasoline, gasohol, aviation gasoline, naphtha-type jet fuel, kerosene-type jet fuel, kerosene, distillate fuel oil, residual fuel oil, naphtha or less than 400 degrees Fahrenheit for petroleum feed, special naphthas, road oils, still gas, unfinished oils, motor gas blending components, and aviation gas blending components.

The legislative emphasis in this definition is not whether the material is a fuel, but whether it is refined. Mineral spirits are taxed as special naphthas (P20). The reason mineral spirits are taxed is not because it is a fuel, but because it is refined. The proceeds from the tax on mineral spirits goes into both the Inland Protection Trust Fund and the Water Quality Assurance Trust Fund (P20). Due to the definition of "pollutant" in Chapter 376, F.S., funds from the Water Quality Assurance Trust Fund may be used to clean up solvents such as mineral spirits and naphtha. Because those materials are commonly regarded as solvents rather than fuels, the Inland Protection Trust FUnd is not available as a source of cleanup funds. There is no inconsistency in the Department of Revenue including mineral spirits and naphthas as refined liquid commodities and therefore as "petroleum product" under

224

Chapter 206, F.S., and the Department of Environmental Regulation excluding mineral spirits and naphthas as liquid fuel commodities and therefore as "petroleum products" under Chapter 376, F.S. It is recognized that the taxing provision of Chapter 206 and the cleanup provisions of Chapter 376, both of which deal with various aspects of the Inland Protection Trust Fund and the Water Quality Assurance Fund, should be read in pari materia. See, Ferguson v State, 377 SO.2d 709 (Fla. 1979). In construing statutes in pari materia, the statutes should be construed together and in a manner which will avoid absurd results. Moore v State, 343 So.2d 601 (Fla. 1977). In this case, the Department's construction of its statute does not lead to an absurd result. Mineral spirits, although not eligible for one fund for which they are taxed, are eligible for the other. While it may be argued that it would have been wiser or more equitable to the stores of mineral spirits to have allowed them the benefits of the Inland Protection Trust Fund, rather than limit their use to the Water Quality Assurance Trust Fund, it is not the province of this Hearing Officer to make that determination. Had the legislature intended for these terms, which are set forth in the same Act, to have the same meaning, it would have used the same language.

29. Also relevant in determining the substances which the legislature regards as fuels are the other statutory provisions which utilize that term. Chapter 206, Parts I, II and III, F.S., speak respectively to motor fuels, special fuels and aviation fuels. A review of those definitions clearly indicates that mineral spirits and naphthas are not considered to be fuel. The related statutes, e.g., Chapter 212, Part II, F.S., which deals with the tax on the sale of motor fuel and special fuels, and Chapter 527, Part I, which deals with the sale of liquid fuels, do not specifically deal wit naphthas of any kind and it is clear from a review of those statutes that they did not include mineral spirits, xylene and naphthas by implication. A review of the relevant statutory provisions demonstrates that the legislature does not consider mineral spirits, xylene and naphthas to be fuels. The Department's determination that mineral spirits and naphthas are not "petroleum products" since they are not fuels has a reasonable and rational basis.

30. Also relevant in determining the meaning to be given a statutory term is the legislative history. The term under consideration here is "petroleum product." In order to determine what was meant by that term, one may examine the legislative history, including committee reports, and the conditions existing in the state at the time of enactment, 49 Fla.Jur.2d, Statutes, Sections 169-160.

31. The evidence on the record reveals that immediately prior to the

225

passage of the SUPER Act, there was a proliferation of leaking underground gasoline storage tanks around the state. These incidences of contamination were increasing and, due to the volume of leaking gasoline tanks, the ability of the Department to adequately address them was being threatened (T/92-93). The number of sites contaminated with gasoline and contaminants from service station sites grew from "a few" in 1983, to 300 in spring of 1986 to almost 700 by the time the bill passed in June 1986 (T/92-93). The primary and most obvious environmental concern at the time of the passage of the SUPER Act was the volume of fuel spills from service stations, and the inability of the Department to deal with the volume of incidents (T/93).

32. An examination of the staff analyses of the draft Act by the Senate confirms that materials such as gasoline, diesel fuel, kerosene and similar retail fuels were the only materials contemplated or intended by the legislature for inclusion in the Act. Importantly, the reports go through the bill, section by section, and describe the contents of each section as it existed on the date of the report. The last report was prepared on April 29, 1986. The bill was approved on June 26, 1986. *See,* Chapter 86-159, Laws of Florida. The analysis of the meaning of the report is limited by the failure to include a copy of the draft bill which was being analyzed b the committee staff. Without the draft bill, it is difficult to determine the draft language which was before the legislature at the time of the report. However, some insight into the language being analyzed may be gleaned by looking at the language used in the report. In Section 6 of the reports, the definitions which ultimately appear in SUPER Act are discussed. The definitions given in the report for "facility" "petroleum," "petroleum storage system," "response action," and "response action contractor" are virtually the same as they ultimately appeared in the final Act. In contrast, a very significant change from the final language appears in the draft bill analysis of the definition of "petroleum product." It may be presumed from the dramatic change in that definition that the language was amended from the time of the last report's preparation in April to the time the bill was passed in June. The report lists the definition of "petroleum product" in the draft bill as "aviation gasoline and fuels, jet fuel, motor fuel, distillate oils and kerosene." Each of those terms except distillate oils is adequately covered by the final definition of "petroleum product" as passed. The exclusion of the term "distillate oils" from the final version of the Act clearly indicates that some distillates of crude oil would not be covered under SUPER Act.

33. Also contained in the reports are analyses of the conditions

leading to the passage of the Act. The report refers to incidences of discovery of contamination through smelling gasoline in groundwater. The report references the Department's regulatory program for tanks which requires compliance with certain standards. It is important to note that the Department's tank regulation program, as established in Chapter 17-61, F.A.C., only applies to vehicular fuels, i.e., diesel fuel, kerosene, and gasoline. Rule 17-61.040, *Florida Administrative Code.* The report also references the fact that many of the problems which justified passage of the SUPER Act were the result of improper installation of *"fuel oil* and *gasoline* piping, tanks and pumps." (e.S.) (P22(a)(b) and (c) at p.2).

34. The conditions existing in Florida at the time of the passage of the SUPER Act and the legislative history of SUPER Act indicate that the primary purpose of the Act was to alleviate problems associated with the storage of gasoline, kerosene and diesel fuel. I find that based upon the conditions in the state and the legislative history of the Act, the Department had a reasonable and rational basis for the exclusion of solvents such as mineral spirits and naphtha from the definition of "petroleum product."

35. In summary, I find that the Department has demonstrated that mineral spirits and naphtha, particulary VM&P naphtha, are commonly regarded not as fuels, but as solvents. The fact that these solvents may be classified as "refined liquid commodities" for purposes of the taxing statute is not inconsistent with their failure to be classified as "liquid fuel commodities," for purposes of the cleanup statute, particularly when they are eligible under the other tax and cleanup fund, the Water Quality Assurance Trust Fund. From a physical standpoint, these solvents, since they are petroleum distillates, are not greatly physically different from materials which are ordinarily regarded as fuels. However, the legislature chose to condition its definition of petroleum product on the common use of the product as a fuel. It is not the function of the undersigned hearing officer to question the wisdom of the legislature's enactments, but rather to determine if the Department has construed the enactment in a permissible manner. Given the totality of he circumstances, as such, I find the Department's interpretation of petroleum and petroleum product as excluding mineral spirits, naphthas and other solvents to be permissible and within its authority.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction of the subject matter of and the parties to this proceeding. Section 120.57(1), Florida Statutes.

**227**

2. The Department has the responsibility and statutory authority to implement and administer the provisions of Chapter 376, Florida Statutes.

3. As the parties asserting the affirmative, Petitioner has the burden of proof of demonstrating entitlement to participate in the Early Detection Incentive Program.

4. In construing the term "petroleum product" the Department has, through the use of the doctrine of *ejusdem generis,* limited the field of included substances to those which are generally similar to those enumerated. I conclude that such a use of *ejusdem generis* is appropriate. The courts of Florida have often held that:

> [u]nder the well-established doctrine of ejusdem generis, where general words follow the enumeration of particular classes of persons, the general words will be construed as applicable only to persons of the same general nature or class as those enumerated, unless an intention to the contrary is clearly shown. (citations omitted). This rule of statutory construction is based on the principal that if the legislature had intended the general words to be used in their unrestricted sense, they would not have made mention of the particular classes.

*Soverino v State,* 355 So.2d 269, 273 (Fla. 1978). To phrase the requirements of the doctrine differently, the Fifth District Court of Appeal has held that:

> [u]nder the doctrine of "ejusdem generis," when a enumeration of specific things if followed by some more general word or phrase, then the general word or phrase will usually be construed to refer to things of the same kind or species as those specifically enumerated (citation omitted). This doctrine is actually an application of the broader maxim "noscitur a sociis" which means that general and specific words capable of analogous meaning when associated together take color from each other so that the general words are restricted to a sense analogous to the specific words.

*Transcon Trailers, Inc. v Northland Insurance Company,* 436 So.2d 380, 381 (Fla. 5th DCA 1983).

5. I specifically conclude that mineral spirits, xylene and naphtha, especially VM&P naphtha, are not fuels. The legislature has used the term "fuel" in its plan and ordinary sense. Words used in their plan and ordinary sense should be afforded their "common or ordinary meaning." *State v Buckner,* 472 So.2d 1228, 1229 (Fla. 2d DCA 1985), *also, Killings ex rel. Burks v Estate of Burk,* 478 So.2d 827, 829 (Fla.

228

1st DCA 1985); *Seaboard System Railroad, Inc. v Clemente,* 467 So.2d 348 (Fla. 3d DCA 1985). Mineral spirits, xylene and naphthas, when given their commonly accepted meanings, are solvents rather than fuels. When used in a strictly petroleum standpoint, mineral spirits, xylene and naphthas are still almost universally regarded as solvents, notwithstanding the fact that, due to their low flashpoint, then can burn. Every dictionary, encyclopedia, and technical document introduced as evidence specifically and unequivocally identify mineral spirits, xylene and naphthas as solvents. The fact that petroleum distillates like mineral spirits are used in limited applications for charcoal lighter and as an additive to outboard motor oil does not change their predominant and universally recognized use as a solvent.

6. Petitioner's averment that they should be entitled to utilize the Inland Protection Trust Fund since they are taxed for the fund was considered. However, mineral spirits and naphthas, although not eligible for the Inland Protection Trust Fund, are eligible to use the other fund for which they are taxed, the Water Quality Assurance Trust Fund. Petitioner asserts that it would be more equitable and perhaps wiser to construe the terms in Chapters 206, F.S., as meaning the same thing, despite the fact that the words used by the legislature in those definitions are different. It is not the duty of this Hearing Officer to make that determination. The Supreme Court of Florida has consistently held that "[t]he legislature has broad discretion in determining necessary measures for the protection of the public health, safety and welfare, and we may not substitute our judgment for that of the legislature as to the wisdom or policy of a legislative act." *State v Yu,* 400 SO.2d 762, 764 (Fla. 1981). The legislature used different terms with clearly different emphases in defining petroleum product in Chapters 206 and 376, F.S. The legislature's "deliberate use of a quite different term . . . is strong evidence indeed that it intended a quite different meaning." *Ocasio v Bureau of Crimes Compensation, Division of Workers Compensation,* 408 So.2d 751, 753 (Fla. 4th DCA 1982); 49 Fla. Jur.2d Section 133. Had the legislature intended for the two definitions to mean the same thing, it would have used the same language.

7. The conditions existing in the state at the time the Act was passed, the expressions of policy and intent from the legislature as set forth above, and the change in language of the definition of "petroleum product" in the draft bill to the definition in the Act provides extrinsic evidence in support of the Department's position that mineral spirits, xylene and naphtha are not included substances for purposes of SUPER Act. The plain meaning of the language used in the Act and

**229**

related statutes provides intrinsic evidence in support of the Department's position.

8. The construction given to Chapter 376.30, F.S., *et seq.,* by the Department is entitled to great deference. *Department of Insurance v Southeast Volusia Hospital District,* 338 So.2d 815, 820 (Fla. 1983). The Florida Supreme Court, in determining the manner in which an agency's construction of a statute which it has been given the duty to interpret and enforce has consistently held that:

> We have long recognized that the administrative construction of a statute by an agency or body responsible for the statute's administration is entitled to great weight and should not be overturned unless clearly erroneous. *State ex rel. Biscayne Kennel Club v Board of Business Regulation of Department of Business Regulation,* 276 So.2d 823 (Fla. 1973). Administrative agency expertise in regulatory interpretation has been similarly acknowledged in the federal courts. In *Curtis v Taylor,* 625 F.2d 645, 654 (5th Cir.), modified *rehearing denied,* 648 F.2d 946 (5th Cir. 1980), the circuit court of appeals held that an agency's interpretation of a regulation it has promulgated is entitled to deference when the meaning of the regulation is not clear. The fifth circuit has also concluded that if an agency's interpretation of its own regulation is merely one of several reasonable alternatives, it must stand even though it may not appear as reasonable as some other alternative. *Expedient Services, Inc. v Weaver,* 614 F.2d 56 (5th Cir. 1980).

*Pan American World Airways v Florida Public Service Commission,* 427 So.2d 716, 719-720 (Fla. 1983). Similarly, the First District Court of Appeal has held that:

> . . . when the agency committed with statutory authority to implement a statute has construed the statute in a permissible way under APA disciplines, that interpretation will be sustained though another interpretation may be possible.

*Department of Administration v Nelson,* 424 So.2d 852, 858 (Fla. 1st DCA 1982).

9. The Department's construction of the term "petroleum product" as contained in Section 376.301(10, F.S., is adequately supported by the record in this proceeding. *See Florida Cities Water Company v Florida Public Service Commission,* 384 So.2d 1280 (Fla. 1980). Based on the Findings of Fact as a whole, I conclude that the Department's determination that mineral spirits and naphtha do not fall within the ambit of the term "petroleum product" has a reasonable and rational

230

basis. Petitioners have failed to demonstrate that the Department's interpretation of its statute, when construed as a whole, is not within the range of permissibility. In fact, given the full range of facts contained herein, the Department's decision to exclude mineral spirits, xylene and naphthas is the only possible interpretation which would be in keeping with the nature and use of the substance. In the totality of the circumstances, I conclude that the Department has arrived as a construction of Section 376.301(10) which is well within the permissible range of interpretations.

## RECOMMENDATION

Having considered the foregoing Findings of Fact, Conclusions of Law, the evidence of record, the candor and demeanor of the witnesses, and the pleadings and arguments of the parties, it is therefore, RECOMMENDED that:

The substances known as mineral spirits and naphtha be found not to be "petroleum products" within the scope of Section 376.301(10), F.S., and that the Petitioner, Commercial Coating Corporation, be determined to be ineligible for participation in the Early Detection Incentive Program.

RECOMMENDED this 13th day of July, 1988, in Tallahassee, Leon County, Florida.